UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARJORIE MURPHY,                              :
                                             :
            Plaintiff,                        :
                                             :
            v.                                :              C.A. No. 15-545-ML-PAS
                                             :
AETNA INSURANCE COMPANY,                      :
                                             :
            Defendant.                        :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This matter is before the Court for report and recommendation on the parties' cross motions for summary judgment; they seek a determination whether benefits are owed under an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* ECF Nos. 14, 16. Plaintiff Marjorie Murphy is a former employee of FM Global, where she was covered by a long-term disability insurance policy administered by Defendant Aetna Insurance Company ("Aetna"). Plaintiff received disability benefits under the plan from 2006 to 2014; however, in July 2014, Aetna determined that she was no longer totally disabled as defined by the policy and terminated benefits. Plaintiff appealed the termination pursuant to Aetna's internal review process and was denied. She now seeks this Court's review of that denial. The parties agree that Aetna has discretionary responsibility and fiduciary authority to determine eligibility for benefits under the plan and that its determinations will be reversed only if found to have been arbitrary and capricious.

Because I find that the decision of the plan administrator was supported by substantial evidence and was not tainted by a material conflict of interest, I recommend that Plaintiff's motion be denied, and Aetna's motion be granted. The reasons follow.

I.      **Background**

Plaintiff is a 51-year old woman, with a high school education and clerical and computer skills.  Administrative Record ("AR") at 573.  She was employed by FM Global, an insurance company with offices in Rhode Island.  According to the complaint (ECF No. 1), she worked full time as an insurance claims processor, providing administrative support for the company's adjusters.  In April 2006, Plaintiff took a medical leave of absence "due to acute liver failure related to alcoholic hepatitis, with manifestations of altered mental status, failure to thrive and ascites, and was hospitalized and treated for acute liver disease."  Compl. ¶ 9.  Plaintiff was treated at the Lahey Clinic for alcoholism and has maintained sobriety since.  Compl. ¶ 10.  As a result, her liver disease has stabilized.  Aetna's Statement of Undisputed Facts ¶ 14 ("A-SUF") (ECF No. 15).  Nevertheless, her health problems did not fully abate.  She continued under the care of gastroenterologist Dr. Raymond Mis for "chronic pancreatitis, kidney disease, cirrhosis, hepatitis, hepatic encephatopathy and all of the side effects of these diseases and medications used for treatment."  Compl. ¶ 11.  In addition, Plaintiff suffers from osteoarthritis, and has had both hips and both shoulders replaced.  Compl. ¶ 13.  Finally, Plaintiff states that she "further suffers from some type of autoimmune disease related to her chronic disease pattern, has test results showing positive ANA[1] and, as a result, suffers from debilitating fatigue."  Compl. ¶ 14.  While the record repeatedly confirms that Plaintiff suffers from the symptoms of fatigue and pain, it is also clear that her treating physician has not yet assigned a specific diagnosis to explain the cause.

Plaintiff began collecting long-term disability benefits under the Aetna policy on October 26, 2006; she has never returned to work at FM Global.  Compl. ¶ 18.  She continued to receive long-term disability benefits for approximately eight years, until 2014.  Compl. ¶ 20.  For the

---

[1] According to the internet, "ANA" is antinuclear antibody.  See http://www.webmd.com.

first two years, she collected under the policy provision that defined disability as the inability to

perform her FM Global job.  Compl. ¶ 19.  For the ensuing six years, she met the definition of

total disability under the policy, in that she was deemed unable to perform "any reasonable

occupation"[2] because of injury or disease.  A-SUF ¶¶ 7, 12.  For part of this time, from October

2008 to May 2009, Plaintiff worked at the office of the mayor of Warwick, Rhode Island, for

about fifteen hours a week.  A-SUF ¶ 15.  In October 2009, Plaintiff's application for Social

Security disability insurance benefits was denied.  AR at 456-58.  Also during this period,

Plaintiff received "several" letters from Aetna announcing that her benefits would be terminated;

however, each time she appealed pursuant to Aetna's internal administrative appeal process and

was able get the benefits reinstated.  Compl. ¶ 20.

Throughout this period, Dr. Mis monitored Plaintiff's liver and kidney functions,

periodically reporting on Plaintiff's status to her primary care doctor, Dr. Keith Callahan.  On

May 15, 2012, Dr. Mis wrote to Dr. Callahan:

> Since our last evaluation, Marjorie looks wonderful.  Her chief complaint remains
> fatigue.  She remains quite active and has actually asked if she can return to work.
> That could be quite complicated with her disability policy, but she is bored.  She
> exercises almost six days a week and stays quite active with her son and her pet.

AR at 819.  Dr. Mis remarked further that Plaintiff reported that Dr. Callahan had tested her

thyroid function and the results were "unremarkable."  Id.  He closed by noting, "[s]he

understands that she has had and will probably always have some fatigue, but is certainly saying

all the right things about keeping herself active."  AR at 820.   In August of 2012, Dr. Mis again

wrote to Dr. Callahan about Plaintiff:

> Since our last office visit, Marjorie continues to complain of afternoon fatigue.
> She wakes up like gangbusters.  She exercises daily but by 1 o'clock in the

---

[2] This is defined in the policy as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience."  A-SUF ¶ 12.

> afternoon she is very fatigued… Her son is well and she remains active, but is
> concerned about her fatigue.

AR at 821.  Over a year later, in December 2013, Dr. Mis reported:

> Since our last evaluation, Marjorie became a foster mother and shortly after that
> child came to her she felt that her energy level was great.  She believes that she is
> ingesting caffeine and a lot of candy and that might have contributed to it, but her
> fatigue has since settled in.

AR at 832.  Dr. Mis's follow-up recommendations include a referral for renal insufficiency,

continued monitoring of her now-stable cirrhosis and the suggestion that Plaintiff quit smoking.

AR at 833.  In March 2014, Dr. Mis's report to Dr. Callahan is somewhat more cautionary,

noting:

> The fatigue is quite debilitating to the point where she has not been able to work
> out as regularly as she has.  Although she volunteers two days a week and only
> for a couple of hours, she has to go home and take a nap.

AR at 834.  Nevertheless, in terms of addressing or treating the fatigue, Dr. Mis's only

recommendation was, "[w]e also recommended due to her chronic conditions that she rest and

listen to her body and exercise as her body will allow."  AR at 835.

In May 2014, in connection with a routine review, Aetna claims analyst Richard Collins

wrote to Plaintiff and her doctor requesting information concerning her functional capacity.  A-

SUF ¶¶ 45-46.  AR at 524, 900.  In response, Dr. Mis checked a box on Aetna's questionnaire

that indicated that Plaintiff could perform sedentary work on a full time basis, with "no specific

restrictions except for what she can tolerate."  AR at 901.  In response to the request for

"additional comments," Dr. Mis added, "Patient suffers from chronic fatigue and often needs to

rest/sleep after periods of activity."  AR at 901.  Based on this report, Aetna commissioned an in-

house rehabilitation counselor to conduct a "transferable skills analysis" comparing, *inter alia*,

the functional limits reflected in Plaintiff's records with data from the Bureau of Labor Statistics.

AR at 572.  The resulting June 2014 report identified four open positions not too far from

Plaintiff's home for which she was qualified.  They included administrative assistant, hospital

admitting clerk, claims clerk and personnel clerk.  AR at 575.

Dr. Mis's next status report to Dr. Callahan, dated, June 19, 2014, is not materially

inconsistent with the May 2014 opinion he provided to Aetna:

> Since our last evaluation, the patient was evaluated by Dr. Burke to initiate
> rheumatological evaluation.  Her ANA was positive to 1:160 and an x-ray of her
> wrist did not reveal any degenerative changes.  She herself presents to my office
> for followup of her history of underlying cirrhosis secondary to previous
> alcoholism.  She remains sober and continues to actively participate in a 12-step
> program and actually sponsors other alcoholics.  I am very proud of her.
> Other than chronic fatigue and arthralgias no new medical or surgical issues have
> arisen…She underwent an MRI of the liver and pancreas results of which
> revealed no mass lesions in the liver, but she does have changes consistent with
> chronic pancreatitis with possible two small calculi in the pancreatic duct.  This is
> unchanged from a year ago….No new medical or surgical issues have arisen….
> As for her social history, she remains single, her son continues to live with her,
> she smokes a pack of cigarettes per day, denies alcohol consumption, and she is
> on disability and now likely due to severe fatigue. (sic).

AR at 837.

Based on the information he had gathered, on July 2, 2014, Richard Collins notified

Plaintiff that her benefits were terminated.  AR at 904.  His letter stated:

> We obtained medical records from your treating provider, Dr. Raymond Mis.
> These records indicated that you had been exercising, doing volunteer work, and
> acting as a foster parent.  So that we could understand your current functional
> capacity, we requested Dr. Mis to advise us of your current level if any of
> functional capacity.  Dr. Mis responded advising that you have full time sedentary
> capacity with no specific restrictions or limitations, noting that you have fatigue
> and require rest and sleep after periods of activity.  Using this information, we had
> a Vocational Rehabilitation Consultant complete a transferable skills analysis to
> determine if you have the skills to perform other occupations based on your past
> work history, education and experience, considering your current functional
> capacity as provided by your treating provider.

AR at 904.  The letter went on to explain the review and appeals procedure, and listed additional

materials that Plaintiff could submit should she pursue this option:

We will review any additional information you care to submit, such as medical information from all physicians who have treated you for the condition(s), including but not limited to:
- a detailed narrative report for the period July 2, 2014 through present outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;
- diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;
- any information specific to the conditions related to your disability claim that would assist with the evaluation of your disability status; and
- any other information or documentation that would assist us with the review of your claim.

AR at 904-05.

Plaintiff submitted her appeal on July 14, 2014, with a letter outlining her symptoms including depression, joint problems, chronic fatigue, and "overall feeling of being unwell." AR at 908-09. She also enclosed a July 3, 2014, letter from Dr. Mis, which stated:

Marjorie Murphy has been under my medical care for many years now and suffers from underlying cirrhosis and chronic fatigue. She also has had bilateral ischemic necrosis of her hips and shoulder replacement. Over the years she has developed renal and pancreatic insufficiency and has had quite a difficult time maintaining daily function. Because of her arthralgias and chronic fatigue, as well as impaired hepatic function and renal insufficiency it is hard for Marjorie to perform repetitive tasks and sustain part-time or even full-time employment schedule. Because of her comorbidities multiple complications can occur, which would also affect her ability to sustain employment. It is my professional opinion that Ms. Murphy cannot sustain a steady work environment. However I did advise Marjorie to exercise and try to volunteer some of her time to improve her quality of life.

AR at 857. In addition, Plaintiff submitted a letter she had written to Aetna in 2008, as well as what appear to be print-outs from the internet describing her diagnosed ailments, with her symptoms circled. AR 913-33.

Plaintiff's appeal was initially reviewed by an Aetna nurse who noted the absence of any new physical examinations or diagnostic test results, but added that Plaintiff "may have some

6

restrictions due to orthopedic conditions and past surgeries." AR at 293. The appeal was then

analyzed by an "independent peer review" performed by gastroenterologist Dr. Manoj Mehta.

Dr. Mehta reviewed Plaintiff's records back to 2007, and spoke to Dr. Mis on the telephone. AR

at 554-58. Reporting on the conversation with Dr. Mis, Dr. Mehta related:

> He indicated that from the hepatology perspective, she was very stable and he was
> very impressed with her progress and change in personality after maintaining
> sobriety. He did reiterate that she appeared to have disabling fatigue. He
> mentioned that she had bilateral total hip replacements due to necrosis as well as a
> right shoulder replacement and was in need of a left shoulder replacement. He
> mentioned she had a positive ANA and that it was possible she had another
> diagnosis affecting her ability to work, via her fatigue or somnolence. He also
> mentioned she was a single mother working very hard to take care of her child
> and he felt that this had some bearing on her overall level of fatigue.

AR at 556-57. Based on this investigation and analysis, Dr. Mehta reached the following

conclusions:

> I believe it is s/p alcoholic hepatitis, resolved, but she may have underlying subtle
> cirrhosis. This would be impossible to quantify without a liver biopsy. Her liver
> function appears to be excellent and she has a very low MELD[3] score. She is not
> a transplant candidate, according to the notes provided, and I agree. Her liver
> function appears to be very stable. This may change over time, but currently she
> does not appear to be impaired by any hepatology issue. I agree with Dr. Mis that
> she would benefit from a formal Functional Capacity Evaluation, given her self-
> reported complaints of fatigue. The origin of this is uncertain but it may be
> rheumatologic, autoimmune, or renal, in fact. I do not believe that this is related
> to her liver disease as she does not appear to have any residual liver deficits.

AR at 557. In summing up, Dr. Mehta opined that "[t]here would be no restrictions

specifically from the time frame of 7/2/14 through 9/8/14." Id.

In response to Dr. Mehta's recommendation, Aetna arranged for the Functional

Capacity Evaluation Dr. Mis had suggested to explore "self-reported complaints of

fatigue." The evaluation request specifically asked that the evaluation address "outward

signs of fatigue." AR at 310. The evaluation took place on December 15, 2014, and

---

[3] Model for End-Stage Liver Disease. AR at 546.

involved a review of Plaintiff's medical records, an interview with Plaintiff, and various

tests.  AR 578-81.  As a result of these procedures, the therapist conducting the

evaluation concluded, "…Ms. Murphy demonstrated physical abilities at the

SEDENTARY physical demand level," but also noted that, due to "consistent

subjective reporting of increasing overall total body pain and fatigue, obtaining

consistent objective information during the testing process was difficult."  AR at 581.

Based on all of the information gathered in response to Plaintiff's appeal,

including Dr. Mehta's report and the Functional Capacity Evaluation, Aetna denied

Plaintiff's appeal on December 23, 2014:

> [A]ll examination findings provided for our review document you as consistently
> alert and oriented.  There is no record of daytime hypersomnolence.  Therefore,
> we find no medical evidence of any physical deficits or impairment.  Based on
> this review, we find that the original decision to terminate your LTD benefits was
> correct, and has been upheld on appeal.

AR at 546.  With this determination, Plaintiff had exhausted all internal review procedures

pursuant to the Aetna policy.

Plaintiff asserts that she is still totally disabled and has sued Aetna, claiming it violated

ERISA when it denied her plan benefits under 29 U.S.C. § 1132(a)(1)(B), and breached its

fiduciary duty under 29 U.S.C. § 1132(a)(3).  Compl. ¶¶ 27-33.

## II.      Standard of Review

### A.      ERISA

Although this matter has reached the Court on the parties' cross motions for summary

judgment, the directives set forth in Fed. R. Civ. P. 56(a) are modified in ERISA cases.  As the

First Circuit has stated:

> [I]n an ERISA case where review is based only on the administrative record
> before the plan administrator and is an ultimate conclusion as to disability to be

> drawn from the facts, summary judgment is simply a vehicle for deciding the issue.  This means the non-moving party is not entitled to the usual inferences in its favor.

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  When the plan empowers the administrator to exercise discretion in determining eligibility for benefits, as is the case here, the plan administrator's decision will be reversed only if it is found by the court to have been arbitrary and capricious.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  This standard is described by the Supreme Court as a deferential standard, intended to prevent or rectify an abuse of discretion by the fiduciary.  Varity Corp. v. Howe, 516 U.S. 489, 514-515, (1996).  Under this standard, the court asks whether the plan administrator's determination is plausible in light of the record as a whole; put differently, the court examines whether the decision is supported by substantial evidence in the record.  Niebauer v. Crane & Co., Inc., 783 F.3d 914, 923 (1st Cir. 2015).  When pressing a claim denied by the plan administrator, it is the claimant's burden to establish disability.  Dutkewych v. Standard Ins. Co., 781 F.3d 623, 634 n.7 (1st Cir. 2015).  Importantly, the Court's task is not to conduct a *de novo* review of Plaintiff's condition, but instead to review the decision of the plan administrator for reasonableness in light of the material before it.  In applying this standard, the Court must confine its review to the record that was before the administrator when it made its decision.  Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 19 (1st Cir. 2003); Vukic v. Melville Corp., 39 F. Supp. 2d 163, 166 (D.R.I. 1999).

### B.      Conflicts of Interest

In Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), the Supreme Court directed courts to take a harder look at the deference accorded to the decisions of some plan administrators.  A bare majority of the Court cautioned lower courts to pay particular attention to

conflicts of interest created when an entity, such as an insurance company, serves both as the

ERISA plan administrator charged with making benefits decisions and as the payor for those

benefits:

> Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.  We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.

554 U.S. at 108.  In Denmark v. Liberty Life Assurance Company of Boston, 566 F.3d 1, 8 (1st

Cir. 2009), the First Circuit grappled with Glenn and determined that "judges should weigh a

conflict as they would weigh any other pertinent factor; that is, when relevant considerations are

in equipoise, any one factor, including a structural conflict, may act as a tiebreaker."  More

recently, in McDonough v. Aetna Life Ins. Co., 783 F.3d 374 (1st Cir. 2015), the Court stated

that, while the existence of a structural conflict does not change the standard of review, "it is a

factor that a court may draw upon to temper the deference afforded to the claims administrator's

decision."  Id. at 379.

To facilitate the implementation of these principles, in Denmark, the First Circuit created

a protocol pursuant to which, going forward, plan administrators "can be expected as a matter of

course to document the procedures used to prevent or mitigate the effect of structural conflicts."

566 F.3d at 10.  Aetna has complied with the Denmark protocol and submitted the required

information to confirm its compliance.  Thus, the record establishes that it maintains a strict

separation between the claims and appeals departments and the financial underwriters; a separate

appeals unit for consideration of denied claims; and a compensation system which is not

dependent upon the number of claims paid or denied.  A-SUF ¶¶ 77-86.  Courts in this circuit

have found these kinds of procedural safeguards do not eliminate the specter of a conflict of interest; however, they are "sufficient to limit the weight accorded to the structural conflict." Senechal v. Aetna Life Ins. Co., 2016 WL 3620743 *18 (D.N.H. June 29, 2016) (citing Tracia v. Liberty Life Assur. Co. of Boston, 164 F.Supp.3d 201, 221 (D. Mass. 2016); Tebo v. Sedgwick Claims Mgt. Services, Inc., 848 F. Supp. 2d 39, 54 (D. Mass. 2012)).  Plaintiff does not challenge Aetna's representations about its firewalls; nor does she point to any flaw in the determination of benefits that arguably may be linked to the structural conflict.

III.     **Analysis**

Plaintiff argues that the Court should award her benefits or remand her case to the plan administrator for another review because Aetna's benefits determinations were arbitrary and capricious.  Plaintiff argues that Aetna wrongfully "cherry-picked" the information from her record that supported the termination of her benefits, and disregarded other information that did not, both when it initially terminated her benefits in July 2014, and again in December 2014, when it denied her appeal of that termination.  She argues further that the Functional Capacity Evaluation on which Aetna relied when it concluded that Plaintiff was no longer totally disabled was flawed because it was not designed to assess the impact on her ability to work caused by fatigue and pain.  Finally, focusing on the lack of objective evidence of her impairment, Plaintiff argues that Aetna failed properly to notify her of the documentation she would need to provide to support her claim of total disability.

On its side, Aetna asserts that Plaintiff failed to sustain her burden of demonstrating that she was unable to work at a sedentary job for which she was, or could "reasonably become, fitted by education, training or experience," as required by the plan.  In support of its argument, it relies on the settled principle that the Court must defer to Aetna's assessment as long as it has not

abused its discretionary decision-making authority.  In other words, Aetna's decision must be

upheld if it is "reasoned, and supported by substantial evidence in the record."  Doyle v. Paul

Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998); see also Ortega-Candelaria v. Johnson &

Johnson, 755 F.3d 13, 20 (1st Cir. 2014) ("Specifically, the question is not which side we believe

is right, but whether the administrator had substantial evidentiary grounds for a reasonable

decision in its favor.").

### A.      Weight and Sufficiency of the Evidence – Cherry-Picking

As part of its routine review of its long-term disability cases, Aetna learned that Plaintiff

exercised at the gym, served as a foster parent and performed volunteer work.  Based on this

information, Aetna sent Dr. Mis a form, which he returned, having checked the box indicating

that Plaintiff was capable of performing sedentary work, although he also indicated that Plaintiff

had chronic fatigue and had to rest after any activity.  Citing Dimopoulou v. First Unum Life Ins.

Co., 162 F. Supp. 3d 250, 259-60 (S.D.N.Y. 2016), Plaintiff argues that Aetna arbitrarily chose

to ignore the fatigue warnings and to concentrate only on the checked box.  She contends that

this kind of selective reading of the doctor's report cannot support the termination of benefits.

Relatedly, she argues that Aetna ignored the information she provided to explain the limits on

her apparent activities, including that she volunteered only five hours a week, that her foster

parenting was a temporary role caused by a family emergency and that she went to the gym only

twice a week, only if she was feeling up to it, and, when she did, she had to rest for the

remainder of the day.  AR at 271, 346.  In addition to cherry-picking the record in making the

initial decision to terminate her benefits, she also claims that Aetna was arbitrary and capricious

in denying her appeal, in that it selectively ignored important evidence of disability, including

matters appearing in Dr. Mis's periodic reports to Plaintiff's primary care physician, Plaintiff's

letter to Aetna, and the content of the telephone conversation between Dr. Mis and Dr. Mehta.

AR at 807-37, 908 and 557.

In presenting and countering these arguments, Aetna and Plaintiff unsurprisingly focus on different portions of the 950 page administrative record. Plaintiff points to records that stress the severity of her symptoms, while Aetna emphasizes the parts that demonstrate Plaintiff's recovery and current improved level of activity. However, the presence of contradictory evidence in the record does not mean that Aetna's decision is arbitrary. Boardman v. Prudential Inc. Co. of America, 337 F.3d 9, 15 (1st Cir. 2003). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision," which is simply evidence that is "reasonably sufficient" to support the decision. Wright v. R. R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005). Furthermore, "it is not for a court to determine precisely how much weight an insurer should have accorded a particular piece of evidence in its overall decision." Tsoulas v. Liberty Life Assur. Co. of Boston, 454 F.3d 69, 77 (1st Cir. 2006) (internal punctuation omitted). And it is not arbitrary or unreasonable for Aetna to accord less weight to Plaintiff's own descriptions of her limitations, as recounted in her July 14, 2014, letter, and instead to give greater weight to objective assessments of those limitations. See Boardman, 337 F.3d at 17 fn. 5 ("Prudential was willing to accept that Boardman suffered from the illnesses she reported to her doctors. Rather, Prudential wanted objective evidence that these illnesses rendered her unable to work.").

In this case, there is ample evidence to support Aetna's conclusion that Plaintiff could perform a full-time sedentary job. In making its determination, Aetna relied heavily on the reports of Plaintiff's long-time treating physician, Dr. Mis, who met with her every three months. Plaintiff is correct that Dr. Mis's reports to Dr. Callahan regularly included references to

Plaintiff's complaints of fatigue, but those reports, which were considered by Aetna, also consistently noted her bright affect, her high level of energy at some times of the day, her activities, her volunteer work, regular swimming and trips to the gym.  More importantly, it was Dr. Mis's answer on the May 21, 2014, questionnaire indicating that Plaintiff was capable of working at a sedentary job that initially triggered Aetna's termination of Plaintiff's benefits.  AR at 900.

Plaintiff's primary argument seems to boil down to the proposition that Dr. Mis's reference to "chronic fatigue" in response to the request for "additional comments" amounts to a material alteration of his opinion that she could do sedentary work.  AR at 900-01.  That simply makes no sense; rather, Aetna's interpretation of the opinion – that her functional capacity permits sedentary work with the caution that she would need to rest if she has a period of activity – is based on the plain meaning of Dr. Mis's words and check marks as they appear on the form.  Aetna's letter to Plaintiff informing her of the termination decision confirms that Dr. Mis's note about fatigue was not overlooked, but rather was appropriately considered.  AR at 904.  Unlike the administrator's action condemned in Dimopoulou, Aetna did not rest its decision on one checked box and ignore all the other inconsistent evidence.  162 F. Supp. 3d at 260.  There is nothing internally inconsistent about Dr. Mis's May 2014 opinion nor is there anything "selective" or inappropriate about Aetna's reliance on it.  See Senechal, 2016 WL 3620743, at *19 (error to rely on internally inconsistent opinion written by nurse for doctor who had not seen claimant in five months, opinion which doctor himself later retracted in multiple communications).

After Plaintiff appealed the termination, Aetna's specialists provided further support for Dr. Mis's initial opinion that she could perform sedentary work.  First Aetna's clinical

consultant, a registered nurse, reviewed the appeal and wrote: "[c]laimant and provider letter did not include physical examination findings or diagnostic test results to substantiate a functional impairment." AR at 293.  The consulting nurse specifically noted the diagnosis of chronic fatigue and Dr. Mis's opinion that it would be hard for Plaintiff to sustain full-time employment and nevertheless concluded that Plaintiff would not be "precluded from frequently sitting, occasionally standing/walking and lifting up to 10 lbs." AR at 293.  Dr. Mehta, an independent gastroenterologist, reviewed the records and spoke to Dr. Mis on the telephone.  According to Dr. Mehta, Dr. Mis said that the cause of Plaintiff's fatigue had not been diagnosed, and that he suspected that the demands of being a single mother might be playing a role.  AR at 557.  After considering this information, Dr. Mehta concluded that there appeared to be no restrictions on Plaintiff's ability to work between July and September of 2014, but recommended that a Functional Capacity Evaluation be performed given her pain and "self-reported complaints of fatigue." AR at 557.  The therapist who prepared the evaluation acknowledged Plaintiff's fatigue and pain, but opined that she could perform sedentary work.

To summarize, Dr. Mis, the Aetna nurse, Dr. Mehta and the therapist who prepared the Functional Capacity Evaluation all considered the effects of Plaintiff's symptoms of fatigue and pain on her functional capacity; none improperly limited the analysis to a search for the diagnostic criteria of chronic fatigue; and all opined that Plaintiff was capable of working at a full-time sedentary job.  See Dimopoulou, 162 F. Supp. 3d at 259-60 (error to ignore limiting effect of symptoms of fatigue because of lack of diagnosis of cause of fatigue).  The only opinion potentially supporting the opposite conclusion is Dr. Mis's letter of July 3, 2014, which was written in connection with the disability appeal.  The letter states little more than that full-time work would be "hard" for Plaintiff and seems inconsistent with both his own treating notes and

the opinion he provided directly to Aetna in May 2014.  AR at 857.  Importantly, Dr. Mis did not

purport to retract his May opinion in the July 3, 2014, letter.  Senechal, 2016 WL 3620743, at

*19 (doctor retracted opinion that claimant could work).  Otherwise, no medical specialist opined

that Plaintiff was more limited.  This constitutes more than sufficient evidence to support

Aetna's determination that Plaintiff was no longer totally disabled.  Further, there is nothing in

this record to suggest that Aetna cherry-picked the evidence and arbitrarily ignored substantial

evidence that was consistent with disability.

### B.       Functional Capacity Evaluation

According to Plaintiff, Aetna gave inordinate weight to the Functional Capacity

Evaluation ("FCE"), which was flawed because it could not assess the limitations caused by her

pain and fatigue.  Rather, she contends, the FCE test merely demonstrated that Plaintiff could

perform certain tasks, such as lifting and bending, but failed to take into account the fact that her

pain and fatigue would prevent her from managing a full time work schedule.   AR at 578-81.

The shortcomings of the FCE were compounded, Plaintiff continues, because the clinician

responsible for the test was given only cherry-picked information on which to base the analysis,

and was not apprised of Plaintiff's chronic fatigue and pain.

This argument is unavailing.  For starters, Aetna referred Plaintiff for the FCE in

December 2014, at the suggestion of Dr. Mis and Dr. Mehta, with the specific request that the

provider not only prepare the "normal report provided of functional capacity," but also must

"address any outward signs of fatigue."  AR at 310.  The occupational therapist who conducted

the examination conducted an "extensive interview" of Plaintiff during which she "report[ed] an

extensive and complicated past medical history" that included descriptions of her "pain" and

"chronic fatigue."  AR at 578.  Moreover, the therapist specifically noted that the letters from

Plaintiff's physician were reviewed, in addition to other records.  AR at 578.  Thus, it is simply

inaccurate to posit either that the FCE did not focus on fatigue and pain or that the therapist was

not provided information about those symptoms.

In the resulting FCE report, the therapist recorded specific observations of the effects of

pain and fatigue, including that Plaintiff "self-limited during the testing process as she reported

consistent left shoulder and overall total body pain as well as chronic fatigue during the test."

AR at 580.  The report describes the portions of the test protocol intended to measure Plaintiff's

perception of pain and her perceived ability to perform certain tasks, which demonstrated that

her "perception of performing daily functional tasks is at a very low level."  AR at 581.  Based

on all of the information gathered and the test results, the therapist provided the requested

assessment of Plaintiff's ability to sustain full-time employment:

> Based on the minimal functional data obtained during the evaluation, Ms. Murphy
> demonstrated physical abilities at the SEDENTARY physical demand level.  As
> noted above, due to consistent subjective reporting of increasing overall total
> body pain and fatigue, obtaining consistent objective information during the
> testing process was difficult.

AR at 581.  Thus, it is inaccurate to criticize the FCE for failing to take into account the impact

of pain and fatigue on Plaintiff's ability to manage a full time work schedule.  As the FCE report

request and the FCE report itself establish, it is clear that the FCE therapist was asked to and did

address the limitations caused by Plaintiff's symptoms of fatigue and pain.  Accordingly, there is

no error in Aetna's reliance on the FCE report, along with the other evidence of record.

### C.    Objective Evidence of Impairment

Plaintiff argues that Aetna failed to notify her that it needed objective evidence of her

impairment, and that it failed to inform her what it would deem to be objective evidence.  See

Magee v. Metropolitan Life Ins. Co., 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) ("While

requiring plan participants to submit evidence of objective measures of functional limitations

may be reasonable, participants must be informed of those requirements."). Plaintiff argues that

Aetna's July 2, 2014, letter, which notified her of its decision to terminate her benefits and

explained her appeal rights, was too general. AR at 525. According to Plaintiff, while the letter

invited her to submit additional information, it failed to put her on notice of the kind of evidence

the plan administrator needed to substantiate her claims.

Aetna counters that it did not require Plaintiff to submit specific objective evidence.

Rather, it was looking for any evidence demonstrating the impairing effects of Plaintiff's fatigue

and pain. Cusson v. Liberty Life Assur. Co., 592 F3d 215, 227 (1st Cir. 2010) (plan

administrators did not question diagnosis of fibromyalgia, but properly required objective

verification of its effect). Consistently, Aetna's decision to deny her appeal was based on the

conclusion that "we found no medical evidence of any physical deficits or impairment." AR

546. As Plaintiff herself concedes, Aetna's consideration of Plaintiff's appeal included reliance

on the extensive FCE report, which specifically references the evaluator's observations and

conclusions regarding Plaintiff's pain and fatigue-based limitations as the test protocols were

performed.

In light of Aetna's appropriate focus on the limiting effects of the symptoms as described

by Plaintiff, Aetna's communication about the appeal process is more than sufficient. Its

termination letter states clearly that it had determined that Plaintiff is capable of performing

sedentary work, and invites her to submit information relevant to that determination. That

information, obviously, would include anything that would serve to demonstrate that she is not

capable of performing sedentary work. At bottom, the notice provisions of ERISA "are designed

to spawn meaningful dialogues between plan administrators and plan members." Juliano v.

Health Maintenance Organization of N.J., Inc., 221 F.3d 279, 288 (2d Cir. 2000). The applicable

regulations require only that the communication be "calculated to be understood by the

claimant." 29 C.F.R. § 2560.503-1(g)(iii). Aetna's communication clearly advised Plaintiff of

the reasons it was terminating her benefits and invited her to provide any relevant information in

response. There is nothing deficient about its content.

## IV.     Conclusion

Based on the foregoing, I find that Aetna's determination that Plaintiff is not totally

disabled is plausible and supported by substantial evidence in the record. Accordingly, I

recommend that Defendant Aetna Life Insurance Company's motion for summary judgment

(ECF No. 14) be GRANTED, and that Plaintiff Marjorie Murphy's cross motion for summary

judgment be (ECF No. 16) be DENIED.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 22, 2016